Good morning, Your Honor. I'm speaking on behalf of Mr. Daniel Myers, and with me is Deanna Dotson, who is representing co-defendants of Helen Stadnsky. I'd like to turn first to the lack of probable cause of the affidavit and the search warrant. As the Court is aware, it's a totality of circumstances, and in this case, police officers submitted an affidavit relying very heavily on informant's information. The issue here is, number one, was this informant credible? And also, what was the basis of knowledge for the informant's information? There was some evidence that the informant was reliable, however, there was also no indication as to what the informant's criminal history was. There was some kind of indication that he had criminal charges pending against him or her. We don't know if it was him or her. But that, we don't know exactly what that was, other than he or she was hoping for some kind of reduction in his sentence in exchange for this kind of cooperation. So there was some kind of incentive for the informant to come forward with people. Well, what's the standard of review in this particular matter? For the probable cause? No, for what I'm supposed to do. Well, the standard of review is de novo, but the factual findings are reviewed by the Court for clear error. And when a trial court's determination in an affidavit provides probable cause to issue a search warrant, don't I uphold that unless clearly erroneous? Isn't that the case of Bertrand? Well, yes, Your Honor, but the factual findings underlying the district court's decision are definitely reviewed for clear error, and you would have to uphold this. Well, and here I have Detective Burns as a highly skilled and trained detective. X, reliability has been unquestioned in the past, and reliability is established because the police went different places in order to find out if it were really true. So I guess now, based on me looking at the facts, how do I get around the standard of review? It seems to me that all you're doing is arguing some of the facts around the edge in order to get me to undo the warrant, whereas the judge had all these facts in front of them and determined what the facts were and issued the warrant. Given the standard of review, you can add a few more facts to what you want to put into it and challenge even other things that weren't in the warrant, but in fact, given the standard of review, how do I get around it? That's my question. Well, because this court can review de novo. Well, we can review de novo the rule of law they apply, but the facts are there. Right. I have to give clearly erroneous to. Right, but the way those facts make up probable cause, I think, is what is at issue here. I think one of the problems relying on Detective Burns' training and experience, all he did was corroborate what's known as static or innocent details. All he did was corroborate that Mr. Myers lived at the address and that Mr. Myers had a driver's license showing that he lived at that address. The detective never corroborated any kind of findings of drug dealing or even seeing people coming and going from Mr. Myers' house as has been found in other cases. But the cases you cite of U.S.B. Clark and U.S.B. Mendoza, they're really with anonymous informants, aren't they? We don't know anything about them. Those cases are with anonymous informants. But even cases where the informant is known, this court has looked at the credibility of the informant and the basis of knowledge. And if some of that is kind of lacking, then the police officer may need to come forward and corroborate. Or there may need to be information from another confidential informant of some kind. And in this case, there was none of that. There was much made out of Detective Burns' training and experience. But what did he do in this case? All he did was corroborate innocent details. The other thing is, what the informant provided was much less than what has been upheld in other cases. He didn't tell the date on which he saw these drugs. He didn't say how they were packaged. He said that he thought they were a distributable amount. And that's something that I think there's some dispute in the government's brief. But Judge Mulway, the district judge, specifically found it was the informant who said the amount he saw was distributable quantities. Detective Burns never made that finding. So you're really finding that Detective Burns in the affidavit saying he had 10 years of police officer, over 900 hours of formal training, including narcotics training, 100 arrests for controlled substance violations, 12 prior search warrants, participation in 20 prior searches, has testified in court as an expert, member of the California Narcotics Officers Association. But that is not enough to give him, you're suggesting he's not highly skilled in drink? No, I'm not suggesting that. And then the next is, X is a reliable informant. He's led to at least 10 people being, he's given info leading to the arrest of at least 10 people. He's never given information which was false. He's provided info in consideration of the help on the criminal charge. He'll get no credit if this is false information. He gave the info to Burns 10 days before. He's familiar about this. He knows the white male. I mean, going through this seems a little tough on the standard of review. Yes, Your Honor. But even the Supreme Court has said, if you have a credible informant, you still need to come forward with the basis of knowledge. And I think that's what's lacking in this case. You know, accepting all the factual findings that Judge Moway made, you know, the only, you know, it's very scant. And I think the problem is there's no dates, there's no details, there's nothing other than this informant thought the amount of drugs he saw was a distributable quantity. Well, what did the informant say about the circumstances in which he saw them? I don't believe he said much. He just said he saw Myers with some drugs. And as it came out at trial later, too, Mr. Myers had a roommate as well. All we know is that the informant saw the drugs. We don't know when he saw them. We don't know how much it was. There was no allegations by the informant that he saw any kind of drug paraphernalia or that he knew Myers to be a drug dealer or that Myers, he'd even heard of Myers being a drug dealer. There was nothing like that. And that's very different from a lot of the other cases. Well, but he did say that he saw Myers in possession of drugs in sufficient quantity to sell. That's right, Your Honor. And he did say that he'd seen Myers. He was familiar. First, the informant was familiar with cocaine and marijuana, purchased both in the past. He knew the white male by the name of Myers. He fit Myers' description. Myers had been at X's house 10 days prior to this conversation before with Burns. X had seen Myers in possession of the drugs in sufficient quantity to sell. Then he takes Burns to the residence and Burns verifies to Myers' residence at DMV that he's shown a photo of Myers, X confirms it was him, and he was the one with the drugs. That's, in fact, the fact. Right? Yes, Your Honor. But even so, we would submit that that was not sufficient. Given the lack of detail the informant provided on this situation, I'd like to move on, if I could, to that. Even assuming his reliability in the past. Yes, Your Honor. Does the Court have any questions on the good faith exception? No. Okay. I'd like to move on to the vouching issue, if I could. In this case, the government vouched for the main witness in this case, William Clifford, on several occasions, both in direct and redirect. The government elicited information from Clifford on direct that he must be truthful. If he wasn't to be truthful, he would be facing obstruction of justice charges. That was all in connection with Clifford's plea deal, plea agreement. He didn't have a plea agreement. Or his arrangement. Right. He did have a letter from the government setting forth the terms of his testimony, but he didn't have a written plea agreement. That's right, Your Honor. That's pretty common practice, though, in district court when that happens. You know, the prosecutors get up there right away. They're going to foreclose any argument by the defendant on cross-exam of the witness. Yes, Your Honor. Right away, they bring it out. Yes, Your Honor. That's vouching? Well, because it's suggesting that if he's not truthful, he may be facing obstruction of justice charges as well, that goes beyond just his requirement that he testify truthfully. And so that seems to suggest that somebody may be monitoring his testimony for truthfulness to determine whether or not he might have further repercussions if he lies. And then I think the more problematic one was on redirect. When the government went through this letter and actually read portions of the letter to Mr. Clifford and said, isn't it true that Judge Mulway is the one who's going to be sentencing you? Not, you know, and so no matter what you do here, Judge Mulway is the actual one who's going to be determining your sentence. And that implies that Judge Mulway is going to be monitoring him for truth. On cross-examination, did the defense attorney bring out this arrangement that he had with the prosecution? Well, there was some testimony, but nothing about the fact that Judge Mulway was going to be the one. Do you think the defense attorney wanted to bring out that he might be exaggerating? I'm sure. And the case law has said that, you know, a good defense attorney will cross-examine, you know, a cooperating witness on this kind of information. But even so... Absolutely. Yeah, but even so, you know, the prosecution can't respond with anything that is improper or goes outside the realm of what's proper. Was this vouching connected to a trial? It was not, Your Honor. So this is here on review of plain error. I would point out on that point that against Mr. Myers, Clifford was the key witness. He testified for a day and a half. His testimony was necessary to explain the documents that were seized from Mr. Myers' home. He explained that the packing materials, the air bills, everything had to do with the drug conspiracy. Is Ms. Dodson going to... Yes, Your Honor. So unless there are any further questions, I'll let Ms. Dodson speak. Good morning, Your Honor. It's Deanna Dodson, made up of Mr. Stavinsky. The main issue on Mr. Stavinsky is the reasonableness of his sentence. And I think as we're instructed by the latest cases that we need to take a look at everything, starting with the guideline range, sentencing guidelines first, and then applying everything else. I think one big issue in Mr. Stavinsky's case is his criminal history. He was put in the criminal history category 6. And the majority of his previous convictions were mainly misdemeanors for speeding, suspended license, unlicensed driver, public intoxication under the influence, reckless driving. While these are still convictions, he doesn't rise to the level of a criminal 6 category. Generally, we're thinking of, even under public policy of the criminal history, we're thinking of somebody that has repeat offenses, repeat violent offenses, or even drug offenses. This is his first drug count. And so I think that needs to be taken into consideration, along with the fact that the drug amount, the drug amount was determined by the jury on the special verdict, was found to be 50 grams or more. And that's under the unreasonable doubt. However, the court then found by preponderance almost 900 grams. Now, if the 900 grams, that should have been put before the jury for the jury to make that decision. What was his maximum statutory sentence, possible sentence? Under the statute. With the jury's verdict. Under the statute, the maximum would be life. However, under Booker, Apprendi, Blakely, all the subsequent cases, we're talking the statutory maximum is what has been found by a jury in this case that sets the sentencing range, that you start with this guideline sentencing range. Had it been set at a different level, and then given a reduction for looking at the fatality and circumstances of Mr. Taznitsky in his life. He was an addict. He had a problem with alcohol, plus various other personal factors in his life. A 20-year sentence might be unreasonable in his case. But given the range, with an offense level of 32, I would still have a range of 210 to 262 months, wouldn't I? That's correct. And if I have a range of 210 to 262, and the sentence is 240, I'm in the range. Correct, Your Honor. However, that wouldn't be looking at any of the Section 353 factors that they are supposed to be looking at. We can go to the 353A factors, but if I'm going to look at this having to be put in the guideline range, and not only that, and I'm going to look at all your arguments, the best I can come up with, as I understand, is an offense level of 32, and 210 to 262, 240 is right in the range. That's correct, Your Honor. And then I'm going to look at the 3553A factors to determine if the judge used those in trying to determine what to do, right? Correct. And you're suggesting the judge did not consider 3553A factors on this record? No, I'm not suggesting that, Your Honor. However, the consideration was based on a much higher guideline range to start with. So if you start with the correct guideline range, then you can go down, then that would be a reasonable sentence. Well, the problem comes in that whatever range I put it, it seems like this judge said, it doesn't matter what range it is, I'm still going to give the minimum sentence, 240. Correct, Your Honor. However, I'm arguing that the initial calculation of the sentencing guideline range was incorrect. Okay. And I'm done. We understand. Thank you, Your Honor. May it please the Court, Counsel? Well, I'll start off with the Stavinsky sentencing argument. I think the Court is fairly well-vectored into the issues that are present there, as Judge Smith has pointed out, and I think accurately so. Even if you took the best argument that the appellant can make in this particular instance, you end up in a guideline range, which is right where the defendant ended up. He essentially got a 7 1⁄2 to 13-year downward departure. And this is in a case where he went to trial. I mean, he was a Category 6 guy. He made arguments, of course, that he ought to be sentenced properly within the advisory guideline range that was present or the 800-and-some-odd grade range. Well, her argument is that the district court miscalculated the guideline range and that he should have been much lower than that. Her argument is interesting because, on the one hand, she doesn't like the guidelines, and on the other hand, she indicates that her belief is that he should not have been sentenced in Category 6. And, of course, I think that's a proper argument to make if she wants to make it. My response to that would seem to be that even if he wasn't in Category 6 and was found to be in the advisory guideline range for his drug use, then he would have been well above where he probably would have ended up, about where he ended up anyway. But, once again, the judge took the range that was figured out by the probation office. Counsel for the defense at the time argued that the guidelines were improper and argued, despite the Booker case, that the court could not make findings beyond the jury had decided. And it kind of ended up with both of us making more Booker arguments than anything else. The court ultimately, after deciding on 3553A factors, looked at the entire record, and I don't know that she really credited him for all those Categories 6. Perhaps that was her way of addressing what she thought might have been a more compelling sentencing argument on his prior criminal history, that it was over-represented. But, in any event, she got to the place where she got, which was a 240-month sentence, which we would argue is certainly eminently reasonable for the defense in this case, in his prior criminal history and criminal conflict, which is convicted. Is there anything in the record that indicates that if the judge thought, she had thought that the guideline range was lower, that he would have gotten actually a lower sentence? No, there's not. In fact, the court found that he was assessed, she made the findings that he was assessed with 890 grams of methamphetamine, and she also found that he was a criminal history category number 6. She looked at his background, his past. She considered the fact that he had a son that was a special needs child. And I think that was the primary reason. She thought, he's still a young guy. Let's give him a shot. Let's give him 20 years with good time and other assessments done in a drug program. Perhaps he'll get out in 16 or so. He'll have a chance to get back into his child's life and see if he can make some kind of positive benefit in his life. We, of course, were skeptical about that. We made arguments, and the court came down to where she came down. Any further questions? Okay, vouching. It's always nice to make your own vouching arguments, although I have to say I've never had to make one in the past. The first vouching argument made by the defense here is the vouching of direct exemption. I think Judge Bias was very correct. You're vouching for yourself now. I'm vouching for myself. That's a tough task. But Judge Bias is correct. I mean, the script here, when I get up and do a direct exemption on a drug cooperator, is I want to get out the fact that he has an agreement. The truthfulness provisions of the agreement I could care less about. I don't want him to go into that stuff. But one thing I do want him to do is say, yes, I'm here. I want to get benefits for my testimony, and that's why I'm testifying. When I get that out, of course, before the defense uncovers that little gem. It's a schtick that we follow many times, and I was attempting to follow here. If you look at the record, perhaps someone counseling Mr. Clifford, he'd been fined by his defense attorney, and as I asked my questions to him, he came out with some stuff that I didn't study. If you look at the record in the case, at least in my brief, at 21, my question is, what type of letter was that? And Mr. Clifford says, it was to be truthful on the stand. If not, I'll be in a lot of trouble to do with obstruction of justice. Where he got obstruction of justice, I have no idea. It's unfortunate that he said that, but if you look at the intent of the prosecutor there, it's clear that what the prosecutor's attempting to do is get out the fact that he has a letter, he's testifying pursuant to the letter, and that he wants to get some benefits. He wants to get a lesser sentence, and that's why he's up there on the stand. The redirect vouching, that was a bit to the court that also, along the case of the last minute briefs, that anything we did was in response to credibility attacks upon the defense. Mr. Harrison, in this case, basically made his entire case about Mr. Harrison from the get-go. Mr. Harrison about Mr. Clifford. Mr. Harrison indicated Mr. Clifford was going to lie to the jury, that he was going to divert attention from himself. And the way he did that, and the way he learned to do it, was by working with law enforcement previously as an informant. So he knew all he had to do was point the finger at another guy, and then the charges or the arrest would magically disappear. And that was the inference that Harrison left the jury with throughout his opening statement, and also his cross-examination of Jesse Formey, who was the DEA agent which went on for over the course of two days. There was a substantial credibility attack on William Clifford prior to this jury examination occurring. And so even if we did elicit truthfulness provisions on the letter of the agreement, I submit to the court that we probably could have a credibility attack that had already occurred. Now, moving on to the redirect. Once again, I would reiterate that our questions on redirect were in context with the testimony and evidence that was pending for the court at the time that the redirect was done. I think that there were a couple of primary attacks that were launched. The first was that the receipt of evidence. Of course, there was extensive cross-examination on benefits. The clear implication from the record of this case was, and the one Harrison wanted to leave the jury with, was simply that Mr. Clifford was the one to testify, and the prosecutor would magically give him a lesser sentence. And there are direct questions from Mr. Harrison, leaving the jury with that impression. The government, after Mr. Takahashi, the defense attorney representing Mr. Myers, got up and asked questions about Mr. Clifford's understanding of the letter of unity agreement, the government then came up with a redirect that indicated, or that actually read into the records, provisions of the letter of agreement that dealt with Mr. Clifford's understanding of who sentenced him. The redirect examination essentially covered those terms of the agreement. That's all. It said, you understand that you're going to be sentenced by the judge in this case. You understand the judge is responsible solely for your sentence, and she's the one who will give it to you. That, of course, was going to directly rebut the inference on cross-examination that the prosecutor was going to be the sentencing entity in this case. We gave a 5K motion. The judge might follow it. The judge may not. We also, of course, have the issue of this being a plain error review, and, of course, we look at that for what type of prejudice is going to be caused by the prosecutorial error. In this case, I would argue that there is minimal prejudice if there was any judge. We have a record in this case that demonstrates that Mr. Myers was a substantial and significant drug dealer. The search, and we'll talk about it in a few moments, yielded 336 grams of methamphetamine from his bedroom in a safe. It was a cooperation that he was dealing with somebody in Hilo, Hawaii, for a shipping receipt between Myers and Hawaii. There were macadamia nut boxes in Fremont, California, and Clifford indicated he sent money back to Myers. There was phone evidence linking Myers to Clifford. It was currency. There were drug payout sheets. There was a UPS box with Mr. Clifford's girlfriend's name on it. Clifford indicated he sent back a juice in her name to Myers. And there were drug notes that Mr. Clifford identified as being his notes found in Myers' bedroom. No doubt when we start looking at Myers, this is tangible drug dealing. No doubt that that corroborates any of Clifford's testimony. It was sort of a lesson in prejudice that would have occurred to the defendant based on my alleged voucher. The issue of the search, if the court wants me to belabor that, I think we can move on. I don't think there are any questions. Anything else? Any further questions? Thank you. Do you have support? Thank you. Are there any further questions of the balance counsel? All right. Thank you. The cases just argued are submitted. We'll hear the last case, which is United States v. Clifford.
judges: Schroeder, Paez, Smith